## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**JONATHAN TRENT MASSA**

     *Plaintiff,*

**vs.**                        **Case No. 8:22-cv-796-KKM-JSS**

**TEAMSTERS LOCAL UNION 79**
**and**
**UNITED PARCEL SERVICE, INC.,**

     *Defendants.*

_____/

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN OPPOSITION

COMES NOW Plaintiff, JONATHAN TRENT MASSA ("Massa" or "Plaintiff"), by and through his undersigned counsel, and files this response to Defendant's, TEAMSTERS LOCAL UNION 79 (the "Union" or "Defendant"), dispositive Rule 56 Motion for Summary Judgment.  For the reasons outlined below, Defendant's Motion for Summary Judgment should be denied.

## I. BACKGROUND

While a member of the Union, Massa was subjected to the Union's discriminatory conduct toward him in violation of Title VII and the ADA. Contrary to a collective bargaining agreement, Massa as a dues-paying member of the Union, was terminated by his employer United Parcel Service, Inc. ("UPS")

for work absences attributable to surgery for a displaced kneecap.[1]  (Plf.'s Ex. 1; Bates nos. 375-376, 378; photographs of Massa's injured knee).  However, the Union took discriminatory and retaliatory actions against Massa by complicitly allowing his employer to terminate Massa.  During the over four years when UPS employed Massa as a part-time package handler, the Union never addressed Massa's complaints regarding race discrimination.  Then after his knee injury, when UPS immediately began to issue absence-related disciplinary notices even though Massa had a valid reason to miss work – and had immediately informed the appropriate Union and UPS personnel of his serious knee injury via text messages, the Union shop stewards, Marc Joey Howard ("Howard") and Alan Lucciola ("Lucciola") (collectively the "Union shop stewards") did not prevent Massa's UPS supervisor Elizabeth Harrill ("Harrill") from processing Massa's absence-related termination.  The Union shop stewards remained passive when the UPS computer system generated attendance disciplinary letters which the Union shop stewards and supervisor Harrill further processed to terminate Massa.

## II. RESPONSE TO DEF.'S STMT. OF UNDISPUTED MATERIAL FACTS[2]

---

[1] Massa is simultaneously filing a Notice of Filing Documents in support of his Response, and also attaching the various materials in the record as required by the Fed. R. Civ. P. 56(c)(1)(A). Throughout this Memorandum, references will be made to those materials as follows: "(Plf.'s Ex. __)".

[2] The Union and UPS have contemporaneously filed depositions in support of their motions – Plaintiff Jonathan Trent Massa ("Massa"), Docs. 32-2, 34-2; UPS pre-load supervisor Elizabeth Harrill ("Harrill"), Doc. 34-1; UPS labor manager Fred Dore ("Dore"), Doc. 32-6; Union business

Contrary to the Court's order, the Union presents "Undisputed" facts in its motion and further relies on them in the argument section.  The paragraph numbers for these Responses refer to the corresponding numbers in Defendant's Statement of Undisputed Material Facts. In particular, the following material disputed facts make clear that summary judgment is inappropriate and that this case should be submitted to the jury for resolution:

2.      Disputed.  As a mixed-race individual, Massa elected white as his race on the employment application.  (Massa; 14:2-6).  Massa's visible appearance is predominantly Asian/Pacific Islander.  *Id.*

5.      Disputed.  Disputed to the extent Massa filed 100 to 150 detailed grievances regarding race discrimination but all were disregarded by the Union and UPS.  (Massa; 81:16-23).  These grievances have disappeared.

9.      Disputed.  While Massa disputes and "denies" receipt of any mailed UPS correspondence, Massa disputes paragraph 9 to the extent Union characterizes a certified mailing, without signature proof, as receipt by Massa. Massa is not the sole occupant at the mailing address but resides with his parents and brother.  (Massa; 5:25; 6:1-2).

---

agent Thor Johnson ("Johnson"), Doc. 34-12.  Reference to the depositions will be followed by the appropriate page and line numbers.

10.     Disputed.    The Union initially receives correspondence regarding employee discipline.  (Johnson; 106:4-7).  Massa's testimony reflects that he would be personally informed of disciplinary action by the Union and not through UPS mailings.  (Massa; 51:10-16).

11.     Disputed.  Massa testified that he "assumed" he had been terminated.  (Massa; 33:22-25).  A physician would not inform Massa of his employment status.

12.     Disputed.  Disputed to the extent of intervening events after Massa is denied FMLA leave.  Harrill instructs Massa to apply for short-term disability after he complains of the cancellation of his insurance.  (Harrill; 45:9-12); (*see also* Plf.'s Ex. 1, Bates no. MASSA375; Massa's subsequent October 13, 2020, text to Howard: "No one ever said to get on short term after I get denied from FMLA").

14.     Disputed.  Massa filed 100 to 150 detailed grievances regarding race discrimination, but all were disregarded by the Union.  (Massa; 81:16-23).  Massa also testified that the Union ignored his 150 grievances for 4 years.  (Massa 56:23-24).  The Union's intentional disregard of Massa's grievances rendered the filing of additional grievances useless to redress discrimination against Massa by UPS.

15.     Disputed to the extent Plaintiffs' characterization of the testimony differs from its actual content, which speaks for itself.  Massa testified that both

defendants did not want to "keep me hired and "work together and get me fired". (Massa; 56:4-9).

18 – 19.    Disputed.    Disputed to the extent UPS supervisor signs and processes the short-term disability form on April 9, 2020, that further states an estimated date of return as July 1, 2020. (Plf.'s Ex. 3; Bates No. JTMASSA133).

20.    Disputed. Union business agent Johnson is not informed of the $250 offer by Union shop stewards. Johnson even remained unaware of Massa's knee injury until February-March 2021. (Johnson; 125:18:25, 127:10-19).

21.    Disputed. Disputed to the extent the $250 offer is characterized as a "settlement". Instead, Massa understood the offer as an ultimatum to "either be fired [or] get paid $250 to resign". (Massa; 54:13-14; 18:22-25, 19:1-2). Monetary offers are extended to *active* employees with unresolved grievances. (Johnson; 115:9-23).

23.    Disputed to the extent the communication with the Union shop steward is characterized as good faith representation after his termination of October 13, 2020. Massa testified that both defendants did not want to "keep me hired and "work together and get me fired". (Massa; 56:4-9).

25.    Disputed. Mischaracterization and legal argument to the extent the communication with the Union shop steward is characterized as good faith representation after his termination of October 13, 2020. Massa testified that both

defendants did not want to "keep me hired and "work together and get me

fired". (Massa; 56:4-9).

27 – 29.    Disputed. Legal contention. Lay witness deponent asked to

make law-to-fact application.

30.    Disputed to the extent Plaintiffs' characterization of the testimony

differs from its actual content, which speaks for itself. Mischaracterization and

legal argument based upon multiple pages of testimony. The Union initially

receives correspondence regarding employee discipline. (Johnson; 106:4-7).

Massa's testimony reflects that he would be personally informed of disciplinary

action by the Union and not through UPS mailings. (Massa; 51:10-16). In casual

vernacular, Massa testified that the Union "kind of had my back there" in

reference to the Union completing a basic task on his behalf. (Massa; 48:18-22).

Massa also testified that the Union ignored his 150 grievances for 4 years. (*Id.*;

56:23-24).

31.    Disputed to the extent Plaintiffs' characterization of the testimony

differs from its actual content, which speaks for itself Mischaracterization and

legal argument based upon multiple pages of testimony. Instead, from the

beginning and until the end, Massa provides information in this passage of

testimony regarding the discriminatory animus of the Union and UPS regarding

the $250 offer to resign or be terminated. (Massa; 56:6-9; 58:1-4). Massa further

testifies that both defendants did not want to "keep me hired and "work together and get me fired".  (*Id.*; 56:4-9.

32.     Disputed.  Misstated testimony.  Erroneous citation.

33 – 34.     Disputed.  Massa filed 100 to 150 detailed grievances regarding race discrimination, but all were disregarded by the Union.  (Massa; 81:16-23).  Massa also testified that the Union ignored his 150 grievances for 4 years.  (*Id.*; 56:23-24).  The Union's intentional disregard of Massa's grievances rendered the filing of additional grievances useless to redress discrimination against Massa by UPS.

### III.  PLAINTIFF'S DISPUTED MATERIAL FACTS

### A.  ADVERSE EMPLOYMENT ACTION – MASSA'S TERMINATION

A collective bargaining agreement (the "CBA") between UPS and UNION governs Massa's employment relationship with UPS.  (Doc. 34-9; UPS).  Pursuant to CBA rules, the October 13, 2020 UPS offer of $250 to resign or be terminated was effectively the termination event for Massa.  (Plf.'s Ex. 1; Bates no. 372).  With Massa filing his EEOC charge against the Union on June 1, 2021, Massa did not exceed the 300-day window to render his claim(s) time-barred.  (JSUF, ¶ 10; EEOC filing date).  UPS does not have a right to terminate Massa unless pursuant to a contractual right.  It follows then that UPS may not discharge Massa, like an at-will employee for "good reason, no reason, or bad reason"

without liability.  Instead, the CBA outlines the grievance-resolution process before an employee is formally terminated.  The CBA enumerates major "cardinal" infractions that require immediate termination of an employee. (Johnson; 86:9-25; 87:1-11).  Attendance infractions are not deemed a major infraction and are subject to a separate procedural process under the CBA. "Article 52 – Discharge or Suspension" of the CBA provides that "(A) The Employer shall not discharge nor suspend any employee without just cause…". (Doc. 34-9; page 225).  Section (C) continues to provide an employee with the right to request an investigation to prove an injustice.  (*Id.*; page 226).  "Article 16 – Leave of Absence (Section 2)" allows for an employee to request leave without repercussion.  (*Id.*; pages 51-52).  Johnson testified that the Union and UPS regard disability as a mutually agreed time of absence under Article 16.  (Johnson; 159:8-11).  Section 6 further provides for leave for "4. A serious health condition of the employee." upon qualification.  (Doc. 34-9; pages 56-57).  Section 7 also warrants that UPS would assist Massa in processing his disability claim.  (*Id.*; page 57). Article 36 further provides for a "Nondiscrimination" covenant.  (*Id.*; page 148). Currently, and during Massa's tenure with UPS, Thor Johnson performs dual roles as business agent and Vice President for the Union.  (Johnson; 7:9-13).  In his capacity as a business agent, Johnson is a Union employee.  (*Id.*; 20:16-19). Johnson's deposition testimony reflects that he is unsure whether Massa was

properly discharged by UPS.  (*Id.*; 154:19-21).  UPS knowledge of Massa's disability would prohibit termination by UPS.  (*Id.*; 155:18-23.  Johnson again reiterated that proof of disability would invalidate a termination.  (*Id.*; 156:14-16).  Johnson also states that the UPS computer system will automatically remove an individual from the payroll.  (*Id.*; 157:12-21).  Johnson had to also personally confer with labor manager Dore to process disability payments in excess of $10,000 on behalf of Massa since the UPS computer system designated Massa as terminated and off-payroll.  (Plf.'s Ex. 2, Bates no. 397).

## B.  LACK OF TERMINATION NOTICE TO MASSA <br> (CERTIFIED POSTAL MAILINGS OF DISCIPLINARY LETTERS)

The CBA is silent regarding the form of mailing to effectively serve an employee notice of discharge related disciplinary notices.  However, various CBA sections make a distinction between regular mailing and certified mailing. (Doc. 34-9; pgs. 206, 210; Article 48, Section 1, 6 – "certified mail"; Doc 34-9; pg. 224, Article 51, Section 2 – "mail").  Harrill testified that disciplinary discharge letters are sent out via a certified mailing.  (Harrill; 55:23-25; 56:1-10).  Union business agent Johnson testified that a "mailbox rule" applies for a certified discharge letter to an employe and service is effective the postmark date. (Johnson; 85:9-18).  However, a certified letter infers that both delivery confirmation and actual receipt by an employee is required to be effective. Massa did not receive any disciplinary mailings from UPS before or after his

knee injury.  (Massa 47:3-15; 50:4-6).  Massa is also not the sole occupant at the

mailing address but resides with his parents and brother.  (*Id.*; 5:25; 6:1-2).  Massa

testified that prior to his injury Union shop stewards would personally inform

him of disciplinary correspondence.  (*Id.*; 48:15-19; 49:21-25, 50: 1-4).  Prior to his

injury, Massa would also have only initiated a grievance process after being

instructed by a Union shop steward and being notified of a disciplinary action by

UPS.  (*Id.*; 51:10-16).  Still yet, the Union received all absence-related disciplinary

letters but never notified Massa until after his termination was allowed to be

processed on the UPS payroll database.  (Doc. 34-3; UPS correspondence

stamped received by Union).

## C. <u>WRITTEN GRIEVANCE</u>

Article 7 and Article 51 of the CBA Master Agreement provide for the

"grievance machinery" to allege a violation of the Agreement.  (Doc. 34-9; pgs.

29, 224).  Construing a text message as non-writing would require a narrow

reading of the CBA.  Massa was aware that he would be subjected to discipline

for being absent from work.  Therefore, he immediately informed his work

supervisor Harrill and shop stewards of his knee injury via text messages to

block disciplinary action against him.  (Plf.'s Ex. 1; Bates no. 389).  While Massa

informed all parties via text message of injury, UPS posits that a lack of formal

grievance renders Massa's termination valid.  Even though Massa informed UPS

and Union of his knee injury the day after the accident, a disciplinary letter was issued due to Massa's absence from work on the very same day.  (Doc. 34-9, pg. 72).  Union business agent testified that the use of a standard grievance form is not required under the CBA and "each local union designs their own form". (Johnson; 68:22-25, 69:1-5).  Johnson cautioned to "just write your own piece of paper because it would lead to problems of proof of timeliness and receipt.  (*Id.*; 69:4-25, 70:1-10).  Massa's text message to UPS and Union with pictures of his knee should be deemed a written grievance under the governing CBA to dispute discipline by UPS.

### D.  UNION EXTENDS $250 RESIGNATION OFFER TO MASSA

Massa was subjected to an adverse employment action when he was terminated on October 13, 2020.  Massa was able to return to work, Massa declined to accept a $250 payment option to resign, and was thus terminated from his employment at UPS on October 13, 2020.  (Plf.'s Ex. 1, Bates no. 372). Union shop steward Howard contacted Massa via text-message informing Massa that the Dore had extended an option of either a $250 payment for open grievances if Massa resigned, or be terminated by UPS.   However, Dore does not remember using the word "resignation".  (Dore; 45:12-16).  Dore's declaration further denies Massa was being terminated and instead was trying to resolve "stale grievances.  (Doc. 34-5, ¶ 4).  However, Massa understood the offer as an

ultimatum to "either be fired [or] get paid $250 to resign".  (Massa; 54:13-14; 18:22-25, 19:1-2).  Monetary offers are extended to *active* employees with unresolved grievances.  (Johnson; 115:9-23).  Massa's premature termination due to discriminatory animus was not final until all remedies available under the CBA had been exhausted.  (*Id.*; 116:20-25, 117:1-8).  Therefore, a literal plain reading of the text message reads that an offer was extended by UPS to reach a final resolution regarding Massa's employment status at UPS.  (*Id.*; Johnson; 114:16-20).

### E.  <u>HEARING SCHEDULING (Improper Termination) – March 22, 2021</u>

Union then proceeded to correct Massa's improper termination by scheduling a post hoc hearing with UPS.  (Plf.'s Ex. 2; Bates no. 393).  Irrespective of Massa's refusal to resign, a hearing is scheduled to resolve Mass's improper termination.  (Massa; 53:7-19).  Johnson was not informed of Massa's knee injury until February-March 2021.  (Johnson; 125:18:25, 127:10-19).  When Johnson becomes aware of Massa's accident and subsequent knee surgery, he proceeds to schedule a hearing to appeal Massa's improper discharge and return him to work.  (*Id.*; 129:2-15).  When the shop steward and UPS management are unable to resolve a dispute, a contested matter may be escalated to a hearing.  (*Id.*; 80:6-20).  However, the hearing cannot be scheduled unilaterally by the Union.  UPS' labor manager had to agree to hold a hearing.  (*Id.*; 80:21-25, 81:1-5; Plf.'s Ex. 2,

Bates no. MASSA393).  Johnson and Dore agree to hold a hearing on behalf of

Massa.  (Johnson; 131:4-200).  Johnson testified that there must be a

determination regarding the propriety of Massa's termination.  (*Id.*; 118:3-17).

Johnson further stated that Massa's work absence attributable to his disability

would allow the Union to void Massa's termination by UPS.  (*Id.*; 118:18-25,

119:1-2).

## IV.  LEGAL STANDARD FOR SUMMARY JUDGMENT

A dispute over material facts is genuine "if the evidence is such that a

reasonable jury could return a verdict for the non-moving party."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "[T]he inquiry is whether the

evidence presents sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at

252.  "Where a fact-finder is required to weigh a deponent's credibility, summary

judgment is simply improper."  *Jenkins v. Nell*, 26 F.4th 1243, 1251 (11th Cir.

2022).  It is the movant's burden to show the Court those portions of the record

"which it believes demonstrate the absence of genuine issue of material fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## V.  DISCUSSION

## A.  UNION'S LIABILITY – TITLE VII AND ADA STATUTORY FRAMWORK

The Union is legally prohibited from undertaking actions constituting race-based discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and also discrimination and retaliation based upon a disability in violation of Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* as amended by the Americans with Disabilities Act of 2008 ("ADAAA").  While being governed by the covenants of the CBA, the Union complicitly condoned, participated, and engaged in discrimination and retaliation against Massa.  The CBA further imposed a duty of fair representation upon the Union to represent Massa in good faith.  Nevertheless, the Union's representation of Massa was tainted by discrimination and retaliation.  The Union failed to represent Massa fairly on account of his race and disability, condoned UPS' discriminatory and retaliatory actions toward him, and did not enforce compliance with the CBA's anti-discrimination and retaliation provisions.  Consequently, Massa has suffered damages under the Title VII and ADA statutory framework.  *See also Howard v. International Molders and Allied Workers Union, AFL-CIO-CLC*, 779 F.2d 1546, 1547 (11th Cir. 1986) ("established principle" that labor organizations, along with employers, have an affirmative duty to not violate anti-discrimination laws).

## B.  CONVINCING MOSAIC STANDARD

Notwithstanding the McDonnell Douglas framework's application to Massa's retaliation claims, Massa can survive summary judgment by presenting "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent" by establishing a convincing mosaic of circumstantial evidence for disparate treatment discrimination claims under Title VII and the ADA. *Jenkins v. Nell*, 26 F. 4th 1243, 1250-1251 (11th Cir. 2022) (cleaned up). A "convincing mosaic" may be shown by evidence that demonstrates, among other things, suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent may be drawn. *See generally Lewis v. Union City, Georgia*, 877 F.3d 1000 (11th Cir. 2017). For Massa's race and disability discrimination claims, "establishing the elements of the McDonnell Douglas framework is not, and never was intended to be, the sine qua non for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Lewis v. City of Union City, Georgia*, 934 F. 3d 1169, 1185 (11th Cir. 2019). Furthermore, identifying a proper comparator is not a requirement. ("Accordingly, the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case."; *Id.* (cleaned up)). "Even without similarly situated comparators, "the plaintiff will always survive summary judgment if he [or she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.*

Massa was subjected to an adverse employment action when he was terminated on October 13, 2020.  While Massa was able to return to work, Massa declined to accept the $250 payment option to resign, and was thus terminated from his employment at UPS on October 13, 2020.  The constant interaction between the Union shop stewards and Harrill, the biased supervisor, would be sufficient to create issues of fact regarding Union shop stewards' failure to prevent Harrill from processing the UPS' computer-generated termination letters that led to Massa's discharge.

### C.  ADA and TITLE VII DISCRIMINATION (Wrongful Discharge)

Culminating with his termination, Massa was subjected to racial discrimination at the outset of his employment with UPS and the Union did not pursue his grievances to address those wrongs.  Massa filed 100 to 150 detailed grievances regarding race discrimination, but all were disregarded by the Union. (Massa; 81:16-23).  Massa also testified that the Union ignored his 150 grievances for 4 years.  (*Id.*; 56:23-24).  The Union's intentional disregard of Massa's grievances rendered the filing of additional grievances useless to redress discrimination against Massa.  Then after his knee injury, while he contacted Union shop stewards on multiple occasions, Massa was not provided any meaningful assistance from the Union shop stewards to navigate the disability process within the CBA framework.  The Union shop stewards' actions were

discriminatory and merely perfunctory.  Suspiciously, while Massa contacts

Harrill and the shop stewards immediately after becoming aware of the

cancellation of his medical benefits, Union shop steward Lucciola does not take

any action to prevent Massa's termination on the UPS payroll database.  (Massa,

95:3-19; Plf.'s Ex. 1, Bates no. MASSA373).  While the UPS computer system

generates absence-related disciplinary letter, the Union shop stewards (along

with Massa's supervisor Harrill) let the termination process take its course.  The

Union is provided a copy of all disciplinary correspondence.  (Harrill; 48:20-25;

Johnson; 106:4-7).  Along with the issuance of a January 14, 2020, UPS discharge

letter and stamped received on January 24, 2020, by the Union, UPS designates

Massa as effectively discharged on February 5, 2020.  (Doc. 34-3, pg. 87).

Furthermore, while having knowledge of Massa's knee injury, the Union shop

stewards did not prevent supervisor Harrill from processing Massa's absence-

related termination.  The Union shop stewards remained passive when the UPS

computer system generated attendance disciplinary letters which the Union shop

stewards and supervisor Harrill further processed to terminate Massa.

Foremost, Massa required major surgery from a knee injury incurred on

November 25, 2019.  (Plf.'s Ex. 3).  The following day, Massa informed his

supervisor Harrill and union steward Joey Howard of his injury via text message

to inform them of his accident.  The text message(s) also contained a photograph

of Massa's displaced kneecap.  (Massa; 111:9-11; 26:2-10; 106:14-20.  Harrill does

testify that Howard also informed her of the injury.  (Harrill; 43:22-25,44:1-3).

However, Massa's termination is nevertheless allowed to proceed.  The Union

shop stewards and UPS supervisor Harrill possessed evidence in the form of

Massa's text messages to refute the company's attendance records but instead

allowed the UPS computer system to issue successive discipline leading to

Massa's termination.

     While UPS uses a pretexual reason of Massa's absences due to his knee

injury and subsequent surgery to assert that his premature termination was not

contrary to the governing CBA, the Union shop stewards were actively complicit

in Massa's eventual termination.  No grievance was filed, no investigation was

undertaken, and no meeting was held regarding Massa's premature termination

by his Union shop stewards.  Due to the Union's discriminatory actions against

Massa, in complicity with UPS, UPS finally discharged Massa on discriminatory

grounds when Massa was offered $250 to resign or be terminated.

     Still yet, upon complaining of the cancellation of his medical benefits, the

Union stewards withheld Massa's knee injury and the subsequent UPS

disciplinary action from Johnson.  Johnson is not informed of the $250 offer by

Union shop stewards (Johnson even remained unaware of Massa's knee injury

until February-March 2021); much after the $250 offer was extended to Massa in

October 2020.  (Johnson; 125:18:25, 127:10-19).  Additionally, shop steward

Howard does not inform labor manager Dore of Massa's injury.  (Dore; 57:19-24).

Even Fred Dore, UPS labor manger, does not consult with Thor Johnson but

allows the shop stewards to convey the $250 offer to Massa.  The Union shop

stewards, as agents for the union, acted at the "ultimate decision makers"

responsible for Massa's collective bargaining rights.  While shop stewards are not

Union employees, shop stewards routinely seek guidance from Johnson to

"handle situations" on behalf of Union members.  (Johnson; 32:8-19; 37:6:13).

Johnson testified that shop stewards "in the company's pocket" is a valid

concern.  (*Id.*; 34:10-17).  Johnson acknowledges interacting with Lucciola and

Howard in their capacity as shop stewards.  (*Id.*; 36:3-15).  Johnson testified that

the first level is the shop steward-grievant/employer level and then conflicts

(and grievances) that remain unresolved between the employee and employer

are escalated to the next level where Johnson becomes personally involved.  (*Id.*;

37:16:25; 38:22-25).  At all times the shop steward represents the interests of the

employee.  (*Id.*; 39:2-6).  Johnson also stated that labor manager Dore could

attempt a resolution with a shop steward at the employer level.  (*Id.*; 39:21-23).  A

union shop steward is available for assistance in completing forms; e.g.,

grievance form.  (*Id.*; 76:13-15).  Johnson explicitly states that the Union has a

duty to assist an employee when he is navigating the disability claim process at

the workplace.  (*Id.*; 63:17-21).  Johnson emphatically that "first and foremost" the shop steward and management should resolve the issue.  (*Id.*; 78:17-20).  Both shop stewards spoke with building manager Harrill on a daily basis.  (Harrill; 30:3-4).  Both shop stewards, Lucciola and Howard, had sufficient access to Dore to discuss Union matters and did so routinely.  (Dore; 27:1-25; 28:1-3).  UPS finally discharged Massa on discriminatory grounds when Massa was offered $250 to resign or be terminated.  Since Dore disputes the characterization of the $250 offer, the adverse employment action element presents a genuine factual dispute.

### C.1.  **ADA DISCRIMINATION**

Massa presents his disability discrimination claim based on termination of his employment due to unauthorized work absence(s).  The Union is liable under the ADA statutory framework.  The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to . . . [the] discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  To prevail on an ADA disparate treatment claim, Massa must demonstrate that: "(1) he was disabled, (2) he was a 'qualified individual' when he was terminated, and (3) he was discriminated against on account of his disability." *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016).  Additionally, "A party that obstructs or delays the interactive process is not

acting in good faith.  A party that fails to communicate, by way of initiation or response, may also be acting in bad faith.").  *Bultemeyer v. Ft. Wayne Comm. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996).

## C.2.  RACE DISCRIMINATION

While lying in wait for the UPS computer system to issue absence related disciplinary letters, the Union shop stewards allowed supervisor Harrill to continue with the termination process against Massa.  To establish a prima facie case with respect to his race and national origin discrimination claims, Mass must show that: "(1) he is a member of a protected class; (2) he was subject to an adverse employment action; (3) his employer treated similarly situated employees outside of his protected class more favorably than it treated him; and (4) he was qualified to do the job." *Rainey v. Holder*, 412 F. App'x 235, 237–38 (11th Cir. 2011).  When a plaintiff is unable to produce a comparator, he can still present a triable issue of fact through direct evidence of discriminatory intent or through a "convincing mosaic" of circumstantial evidence that would allow an inference of discriminatory intent. *Lewis v. City of Union City*, 918 F.3d 1213, 1220 n.6 (11th Cir. 2019) (en banc).

In contrast to an at-will employment relationship, the governing rules of the CBA required the employer UPS to collaborate with the Union regarding the employee Massa.  Massa filed numerous detailed grievances charging

harassment and discrimination – with many demanding the termination of Harrill. (Plf.'s Ex. 5). Massa testified that he was racially discriminated against from the very beginning of his employment. (Massa; 28:10-12). Employees of other races, along with employees without seniority were given preferential treatment with work schedules and tasks. (Massa; 28:10-22; Plf.'s Ex. 5, Bates no. 324). In particular, Massa charged that he was placed in unsafe hazardous situations because of discrimination. (Plf.'s Ex. 5, Bates no. 295). Massa also testified that he was subject to race discrimination when UPS and would prevent him from working more hours. (Massa; 28:9-12). Massa would be constantly disciplined after provocation from UPS due to his race – "it happened – it was every single day I went to work." (*Id.*; 80:2-15). Massa filed 100 to 150 detailed grievances regarding race discrimination but all were disregarded by the Union and UPS. (*Id.*; 81:16-23). A particular three-page grievance alleging race discrimination due to different treatment than other workers was filed against Harrill in 2019. (Massa; 85:2-14). However, this particular grievance, like countless others, has disappeared. The Union did not produce hundreds of detailed discrimination grievances that Massa had filed against UPS. (Massa; 85;15-25, 86:1-2). A UPS business record reflects a chart of grievances filed by Massa and yet the chart does not list any discrimination grievances and particularly not the ones presented in Plf.'s Ex. 5. (Plf.'s Ex. 4; Bates nos. D-JM-

34, 35).   Harrill testified that she has never been accused of race discrimination. (Harrill: 13:2-4).  Her denial creates a genuine dispute of a material fact.  Still yet, the Union shop stewards did not properly represent Massa because of discriminatory intent.

### D.  TITLE VII (Race) and ADA RETALIATION

Title VII of the Civil Rights Act prohibits retaliation against any employee who "has opposed any practice made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3(a).  A prima facie claim of retaliation under Title VII requires Massa to demonstrate that (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse employment action; and (3) there was a causal connection between his protected activity and the adverse action. *Lucas v. W.W. Grainger*, 257 F.3d 1249, 1260 (11th Cir. 2001).

By taking a material adverse employment action against Massa, in the form of wrongful termination, UPS violated 42 U.S.C. § 2000e-3(a) under Title VII of the Civil Rights Act.  UPS' stated reasons for termination are pretextual and proffered to disguise retaliatory animus.  A plaintiff who claims retaliation under Title VII must establish that his protected activity was a "but for" cause of the adverse action.  After the plaintiff establishes a prima facie case, the employer must prove, as part of its affirmative defense, that the protected activity was not the "but for" cause of the adverse action.  The Union shop stewards are the

ultimate decision makers.  The constant interaction between the Union shop

stewards and Harrill, the biased supervisor, would be sufficient to create issues

of fact regarding Union shop stewards' failure to prevent Harrill from processing

the UPS computer-generated termination letters that led to Massa's discharge.

The shop stewards further did not inform the Union business agent of Massa's

injury until February – March 2021; much after the $250 offer was extended to

Massa in October 2020.  Even Fred Dore, UPS labor manger, does not consult

with Thor Johnson but allows the shop stewards to convey the $250 offer to

Massa.

      To establish a causal connection between a protected activity and an

adverse action, "a plaintiff must show that the decision-makers were aware of

the protected conduct and that the protected activity and the adverse action were

not wholly unrelated." *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008)

(quoting *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000))

(quotations and alterations omitted).  To establish this showing, a plaintiff must

establish that "the decision maker was aware of the protected conduct at the time

of the adverse employment action." *Brungart v. BellSouth Telecomms., Inc.*, 231

F.3d 791, 799 (11th Cir. 2000).  "As a starting point for any retaliation claim, a

plaintiff needs to show (among other things) that the decisionmaker actually

knew about the employee's protected expression." *Martin v. Fin. Asset Mgmt.*

*Sys.*, 959 F.3d 1048, 1053 (11th Cir. 2020) (emphasis added).  A jury could conclude that Massa complaint to Union and UPS was based upon him being terminated because of his knee disability.  Massa's conduct conveyed a protest of discriminatory practices by the Union and UPS.

### D.1.  KNOWLEDGE OF TITLE VII PROTECTED ACTIVITY

Massa was retaliated against by the Union because he engaged in statutorily protected expression by filing grievance complaints regarding race discrimination.  Multiple grievances charging race discrimination against Harrill and demanding Harrill's termination were signed upon receipt by Harrill.  (Plf.'s Ex. 5).  Harrill signs a particular race discrimination grievance filed against her on August 13, 2019.  (*Id.*, Bates no. 319).  While Harrill testified that she has never been accused of race discrimination.  (Harrill: 13:2-4).  Harrill's denial creates a genuine dispute as to a material fact.  The shop stewards also signed the grievance forms.  (Plf.'s Ex. 5).  The shop stewards had actual knowledge of protected activity of his race-based complaints, and Massa's knee injury allowed the Union the perfect cover to allow the UPS termination process to take its course.

### D.2.  KNOWLEDGE OF ADA PROTECTED ACTIVITY

While the Union does not inform Massa of any absence-related disciplinary correspondence, Massa becomes aware that his medical insurance

has been cancelled in January 2020 upon a visit to his doctor's office.  Massa is disturbed that he has lost his medical benefits after he became disabled (and requested FMLA leave), also potentially terminated.  Massa immediately complained to the Union shop stewards via text messages and was then instructed to apply for short-term disability.  (Massa; 98:7-17).  Shop steward Lucciola contacted Massa via telephone Massa and assured him that the matter would be resolved.  (Plf.'s Ex. 1; Bates no. 374; Massa, 33:8-21; 95:3-23).  The actual knowledge of the disability complaint is further established because the shop steward assured Massa that a resolution will be sought regarding the cancellation of his medical benefits.  Concurrently, Massa had also complained to his supervisor Harrill and was instructed by Harrill to apply for short-term disability benefits after his complaint.  (Harrill; 45:9-12).  Massa later recounts that he is instructed to apply for short-term disability after complaining to Harrill regarding the cancellation of his medical benefits.  (Plf.'s Ex. 1, Bates no. MASSA375; Massa's subsequent October 13, 2020, text to Howard: "No one ever said to get on short term after I get denied from FMLA").

In retaliation, the shop stewards allowed the complaints regarding the cancellation of Massa's insurance benefits to prejudice them by condoning the processing and finalizing of Massa's termination on the UPS payroll database. To establish this final causal requirement for a prima facie case of retaliation, the

employee need only demonstrate that the protected activity and the adverse action were not wholly unrelated. *Shotz v. City of Plantation*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003). "Magic words" are not required to put an employer on notice, but protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue. *Martin v. Financial Asset Management Systems, Inc.*, 959 F. 3d 1048, 1059-1060 (11tth Cir. 2020). Massa expressed his complaint in his communication with the Union shop stewards to inform them of the cancellation of medical benefits after he became disabled and had applied for extended FMLA leave. Massa testified that while he contacted Union shop stewards regarding the cancellation of his insurance, he did not file a formal written grievance. (Massa; 34:1-4). Still yet, a formal, written grievance should not be deemed the sole means to establish protected activity. A genuine factual dispute exists regarding the necessity of filing a written grievance to establish protected activity when Massa did not trust the union – especially when Massa had to pay for his own medical bills. (Massa' out-of-pocket medical bills exceeded $10,000; Plf.'s Ex. 2, Bates no. 397). Massa believed the cancellation of his medical insurance and potential termination by UPS violated the ADA. The subject matter of Massa's complaint to the Union shop stewards was sufficient to alert the Union that unlawful discrimination was at issue. Therefore, the Union should be charged with notice of protected activity based

on actual knowledge.  A jury could conclude that Massa's complaint to the Union shop stewards regarding the cancellation of medical benefits, and potential termination, was because of his knee disability.  Massa's conduct conveyed a protest of disability discrimination.  A reasonable jury could find that the Union shop stewards orchestrated the finalization of Massa's termination for retaliatory reasons rather than a good faith belief of an unapproved leave of absence.

Massa does not have to show the Union's knowledge of his disability complaint solely by direct evidence.  Awareness of the protected activity may also be established by producing circumstantial evidence from which a reasonable jury could infer the decision maker's knowledge.  *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002) (discussing cases).  A plaintiff may produce circumstantial evidence to establish this element of his claim.  *See Id.* Circumstantial evidence alone is sufficient to demonstrate awareness.  "A plaintiff need show only that the expression and adverse action are not completely or wholly unrelated." *Williams v. Polk County Board of County Commissioners*, No. 8:20-cv-2842-WFJ-SPF, (M.D. Fla. Nov. 18, 2022) (cleaned up).

Courts construe the causation element "broadly" and "a plaintiff need only demonstrate 'that the protected activity and the adverse action were not wholly unrelated.'" *Debe v. State Farm Mut. Auto. Ins.*, 860 F. App'x 637, 639 (11th

Cir. 2021) (citing *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 n. 30 (11th Cir. 2003)).  To do so, however, "[t]he plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action." *Id.*  Causation may be established where "numerous adverse events . . . occurred within weeks after each of [the plaintiff's] protected acts."  *Norman v. McDonough*, No. 2:20-cv-01765-KOB, 2022 WL 3007595, at *9 (N.D. Ala. July 28, 2022).  Even until the $250 offer, Massa remained discharged from the UPS payroll database.  (Johnson; 157:12-21).

### D.3.  TEMPORAL PROXIMITY

The Union's complicit behavior with UPS creates a triable issue on a causal link between Massa's protected activity and the adverse employment action. Temporal proximity and its measurement are deemed just one piece of evidence to establish causation.  *See Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018). There must be other circumstantial evidence of retaliation.  *Id.*  "The relatedness between the protected activity and adverse action generally may be demonstrated by close temporal proximity between them….But mere temporal proximity, without more, must be very close."  *Jones v. Unity Behavioral Health, LLC*, No. 20-14265, 2021 U.S. App. LEXIS 34835, at *5-6 (11th Cir. Nov. 23, 2021) (citing Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007)). Still yet, there were not any intervening events to sever any causal inference.

*Henderson v. Fedex Express*, 442 F. App'x 502, 506 (11th Cir. 2011).  While Massa was not present at the workplace, the termination process continued against Massa.  While the adverse employment action – namely the $250 offer – did not occur immediately – the facts of the case allow Massa to establish legal temporal proximity and the length of time should not undermine any inference of causation.  Here, a reasonable jury could find that the temporal proximity between the Union shop steward's knowledge of Massa's protected activity and the adverse employment action supports an inference of causation.  Massa must demonstrate that UPS' provided reason is pretextual – that is, that the protected activity was the but-for cause of the adverse employment action.  *Pennington v. City of Huntsville*, 262 F.3d 1262, 1266 (11th Cir. 2001); *see Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1190 n.13 (11th Cir. 2020) (applying the but-for causation test at the pretext stage of the summary judgment examination rather than applying it to the plaintiff's prima facie case).

### E.  PRETEXT ANALYSIS FOR MASSA'S CLAIMS

Massa's employer's stated reason – unapproved leave of absence – for termination is pretextual and proffered to disguise retaliatory and discriminatory animus.  A plaintiff who claims discrimination and retaliation under Title VII (single-motive) and ADA must establish that his protected activity was a "but for" cause of the adverse action. After the plaintiff establishes a prima facie case,

the employer must prove, as part of its affirmative defense, that the protected activity was not the "but for" cause of the adverse action.

UPS' supposed "legitimate" attendance-based reason for terminating Massa is undermined by the facts mentioned supra as evidence of a convincing mosaic. A genuine issue of fact exists about whether Massa's absence from work was unexcused. Massa had informed the Union shop stewards and the building manager of his knee injury. A reasonable jury could conclude that the Union complicitly allowed Massa's termination for pretextual reasons because of Massa's race and/or race-based complaints – and alternatively because his disability and subsequent complaint. In opposing a motion for summary judgment, an employee may make that showing by presenting evidence that calls into question an employer's sincere belief in its proffered reasons for the employee's termination. *See Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005). To establish pretext at the summary judgment stage, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could find them unworthy of credence." *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)). Still yet, while having actual knowledge of Massa's complaints regarding race

and disability discrimination against Harrill constituting protected activity, a reasonable jury could further find that the Union circumvented the CBA and did not prevent the termination process.  Massa has established the inconsistent application of policies as additional circumstantial evidence of discrimination as well as pretext.  *See Berg v. Fla. Dep't of Labor & Emp't Sec.*, 163 F.3d 1251, 1255 (11th Cir.1998) (noting that "inconsistent application of employment policies [may be] circumstantial evidence of discrimination").  Still yet, viewing the individual events as one adverse employment event – culminating in the $250 offer – a reasonable jury could find retaliation was the but-for cause of Massa's termination. "So long as the plaintiff's sex [or other protected characteristic at issue] was one but-for cause of that decision, that is enough to trigger the law." *See Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020) (cleaned up).  Massa has provided evidence from which the jury could reasonably conclude that but for his alleged protected act, UPS would not have terminated him.

## VI. <u>CONCLUSION</u>

At summary judgment, all facts and inferences must be taken in favor of Plaintiff, the non-movant.  *See Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014). This includes inferences that are "not necessarily the most plausible." *Valderrama v. Rousseau*, 780 F.3d 1108, 1120 n.14 (11th Cir. 2015).  The court "may not weigh

conflicting evidence or make credibility determinations" and if there are "disputed issues of fact, the court may not decide them; rather, [it] must deny the motion and proceed to trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012). Plaintiff's evidence is sufficient to create a jury question as to whether a reasonable person would find that Defendant Union discriminated against Massa because of his race and disability, and also retaliated because of his complaints. Based upon the foregoing, Plaintiff requests that this Court enter and order denying the Union's Motion for Summary Judgment and for any other relief this Court deems just and proper under the circumstances.

Dated: May 30, 2023                     Respectfully submitted,

                                        */s/ Derek P. Usman*
                                        Derek P. Usman
                                        Florida Bar No. 0120303
                                        Email: derek@usmanfirm.com
                                        505 East Jackson Street, Suite 305
                                        Tampa, FL 33602
                                        (813) 377-1197 telephone
                                        *Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of May, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record appearing on the Certificate of Service generated by the ECF system.

                                        */s/ Derek P. Usman*
                                        Derek P. Usman