THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**JONATHAN TRENT MASSA**

　　　　*Plaintiff,*

**vs.**　　　　　　　　　　　　　　　　**Case No. 8:22-cv-796-KKM-JSS**

**TEAMSTERS LOCAL UNION 79**
**and**
**UNITED PARCEL SERVICE, INC.,**

　　　　*Defendants.*
_____/

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR**
**SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN OPPOSITION**

COMES NOW Plaintiff, JONATHAN TRENT MASSA ("Massa" or

"Plaintiff"), by and through his undersigned counsel, and files this response to

Defendant's, UNITED PARCEL SERVICE, INC. ("UPS" or "Defendant"),

dispositive Motion for Summary Judgment. For the reasons outlined below,

Defendant's Motion for Summary Judgment should be denied.

## I.　BACKGROUND

Massa was subjected to his employer UPS' discriminatory conduct toward

him in violation of Title VII and ADA.  Contrary to a collective bargaining

agreement, Massa as a dues-paying member of Teamsters Local Union 79 (the

"Union"), was terminated by his employer UPS for work absences attributable to

surgery for a displaced kneecap that rendered Massa immobile for months.[1] [2]

(Plf.'s Ex. 1; Bates nos. 375-376, 378; photographs of Massa's injured knee).  Even though UPS employed Massa as a part-time package handler for over four years, UPS portrays Massa as having a perpetual attendance problem.  However, any purported attendance issues prior to his knee injury were attributable to race discrimination on the part of UPS.  Then, Massa's absences after his knee injury were attributable to his post-injury disability.  Nevertheless, after the knee injury, UPS immediately began to issue computer-generated absence-related disciplinary notices even though Massa had a valid reason to miss work – and had immediately informed the appropriate Union and UPS personnel of his serious knee injury via text messages.  Then, Massa's supervisor, Elizabeth Harrill ("Harrill"), did not prevent the UPS computer system from generating disciplinary letters which Harrill further processed to terminate Massa.

## II.  <u>DISPUTED MATERIAL FACTS</u>[3]

---

[1] Massa is simultaneously filing a Notice of Filing Documents in support of his Response, and also attaching the various materials in the record as required by the Fed. R. Civ. P. 56(c)(1)(A). Throughout this Memorandum, references will be made to those materials as follows: "(Plf.'s Ex. __)".

[2] All text message(s) submitted with Massa's Response were produced by Union (and provided in duplicate to UPS) to Plf.'s discovery requests in this matter.  Contrary to UPS' "optional completeness" objection in its Motion, the text messages are not redacted, nor isolated or misleading "sound bites".  UPS also did not find the text messages lacking during the discovery phase (including depositions), nor did it pursue further discovery from any third-party.

[3] UPS and the Union have contemporaneously filed depositions in support of their motions – Plaintiff Jonathan Trent Massa ("Massa"), Docs. 32-2, 34-2; UPS pre-load supervisor Elizabeth

## A. <u>ADVERSE EMPLOYMENT ACTION – MASSA'S TERMINATION</u>

A collective bargaining agreement (the "CBA") between UPS and the Union governs Massa's employment relationship with UPS.  (Doc. 34-9; UPS). Pursuant to CBA rules, the October 13, 2020, UPS offer of $250 to resign or be terminated by UPS was effectively the termination event for Massa.  (Plf.'s Ex. 1; Bates no. 372).  With Massa filing his EEOC charge against UPS on June 1, 2021, Massa did not exceed the 300-day window to render his claim(s) time-barred. (JSUF, ¶ 10; EEOC filing date).  UPS does not have a right to terminate Massa unless pursuant to a contractual right.  It follows then that UPS may not discharge Massa, like an at-will employee for "good reason, no reason, or bad reason" without liability.  Instead, the CBA outlines the grievance-resolution process before an employee is formally terminated.  The CBA enumerates major "cardinal" infractions that require immediate termination of an employee. (Johnson; 86:9-25; 87:1-11).  Attendance infractions are not deemed a major infraction and are subject to a separate procedural process under the CBA. "<u>Article 52</u> – Discharge or Suspension" of the CBA provides that "(A) The Employer shall not discharge nor suspend any employee without just cause…". (Doc. 34-9; page 225).  Section (C) continues to provide an employee the right to

---

Harrill ("Harrill"), Doc. 34-1; UPS labor manager Fred Dore ("Dore"), Doc. 32-6; Union business agent Thor Johnson ("Johnson"), Doc. 34-12.  Reference to the depositions will be followed by the appropriate page and line numbers.

request an investigation to prove an injustice. (*Id.*; page 226). "Article 16 – Leave of Absence (Section 2)" allows for an employee to request leave without repercussion. (*Id.*; pages 51-52). Johnson testified that the Union and UPS regard disability as a mutually agreed time of absence under Article 16. (Johnson; 159:8-11). Section 6 further provides for leave for "4. A serious health condition of the employee." upon qualification. (Doc. 34-9; pages 56-57). Section 7 also warrants that UPS would assist Massa in processing his disability claim. (*Id.*; page 57). Article 36 further provides for a "Nondiscrimination" covenant. (*Id.*; page 148). Currently, and during Massa's tenure with UPS, Thor Johnson performs dual roles as business agent and Vice President for the Union. (Johnson; 7:9-13). In his capacity as a business agent, Johnson is a Union employee. (*Id.*; 20:16-19). Johnson's deposition testimony reflects that he is unsure whether Massa was properly discharged by UPS. (*Id.*; 154:19-21. UPS knowledge of Massa's disability would prohibit termination by UPS. (*Id.*; 155:18-23). Johnson again reiterated that proof of disability would invalidate a termination. (*Id.*; 156:14-16). Johnson also states that the UPS computer system will automatically remove an individual from the payroll. (*Id.*; 157:12-21). Johnson had to also personally confer with labor manager Dore to process disability payments in excess of $10,000 on behalf of Massa since the UPS computer system designated Massa as terminated and off-payroll. (Plf.'s Ex. 2, Bates no. 397).

## B.  LACK OF TERMINATION NOTICE TO MASSA
## (CERTIFIED POSTAL MAILINGS OF DISCIPLINARY LETTERS)

The CBA is silent regarding the form of mailing to effectively serve an employee notice of discharge related disciplinary notices.  However, various CBA sections make a distinction between regular mailing and certified mailing. (Doc. 34-9; pgs. 206, 210; Article 48, Section 1, 6 – "certified mail"; Doc 34-9; pg. 224, Article 51, Section 2 – "mail").  Harrill testified that disciplinary discharge letters are sent out via a certified mailing.  (Harrill; 55:23-25; 56:1-10).  Union agent Johnson testified that a "mailbox rule" applies for a certified discharge letter to an employe and service is effective the postmark date.  (Johnson; 85:9-18).  However, a certified letter infers that both delivery confirmation and actual receipt by an employee is required to be effective.  Massa did not receive any disciplinary mailings from UPS before or after his knee injury.  (Massa 47:3-15; 50:4-6).  Massa is also not the sole occupant at the mailing address but resides with his parents and brother.  (*Id.*; 5:25; 6:1-2).  Massa testified that prior to his injury Union shop stewards would personally inform him of disciplinary correspondence.  (*Id.*; 48:15-19; 49:21-25, 50: 1-4).  Prior to his injury, Massa would also have only initiated a grievance process after being instructed by a Union shop steward and being notified of a disciplinary action by UPS.  (*Id.*; 51:10-16). Still yet, the Union received all absence-related disciplinary letters but never notified Massa until after his termination was allowed to be processed by the

UPS computer system.  (Doc. 34-3; UPS correspondence stamped received by Union).

## C. <u>WRITTEN GRIEVANCE</u>

Article 7 and Article 51 of the CBA Master Agreement provide for the "grievance machinery" to allege a violation of the Agreement.  (Doc. 34-9; pgs. 29, 224).  Construing a text message as non-writing would require a narrow reading of the CBA.  Massa was aware that he would be subjected to discipline for being absent from work.  Therefore, he immediately informed his work supervisor Harrill and shop stewards of his knee injury via text messages to block disciplinary action against him.  (Plf.'s Ex. 1; Bates no. 389).  While Massa informed all parties via text message of injury, UPS posits that a lack of formal grievance renders Massa's termination valid.  Even though Massa informed UPS and Union of his knee injury the day after the accident, a disciplinary letter was issued due to Massa's absence from work on the very same day.  (Doc. 34-9, pg. 72).  Union business agent testified that the use of a standard grievance form is not required under the CBA and "each local union designs their own form".  (*Id.*; 68:22-25, 69:1-5).  Johnson cautioned to "just write your own piece of paper because it would lead to problems of proof of timeliness and receipt.  (*Id.*; 69:4-25, 70:1-10.  Massa's text message to UPS and Union with pictures of his knee

should be deemed a written grievance under the governing CBA to dispute discipline by UPS.

### D.   UPS' $250 OFFER TO MASSA TO FINALIZE DISCHARGE

Massa was subjected to an adverse employment action when he was terminated on October 13, 2020.  Massa was able to return to work but declined to accept a $250 payment option to resign, and was thus terminated from his employment at UPS on October 13, 2020.  (Plf.'s Ex. 1, Bates no. 372).  Union shop steward Howard contacted Massa via text-message informing Massa that the Dore had extended an option of either a $250 payment for open grievances if Massa resigned, or be terminated by UPS.  However, Dore does not remember using the word "resignation".  (Dore; 45:12-16).  Dore's declaration further denies Massa was being terminated and instead was trying to resolve "stale grievances. (Doc. 34-5, ¶ 4).  However, Massa understood the offer as an ultimatum to "either be fired [or] get paid $250 to resign".  (Massa; 54:13-14; 18:22-25, 19:1-2). Monetary offers are extended to *active* employees with unresolved grievances. (Johnson; 115:9-23).  Massa was also not returned to the payroll while his supposed termination was addressed by UPS and the Union.  Johnson testified that Massa would be entitled to be "back on payroll".  (*Id.*; 157:22-25; 158:1-5.) Massa's premature termination due to discriminatory animus was not final until all remedies available under the CBA had been exhausted.  (*Id.*; 116:20-25, 117:1-

8).  Therefore, a literal plain reading of the text message reads that an offer was extended by UPS to reach a final resolution regarding Massa's employment status at UPS.  (*Id.*; 114:16-20).

### E.  HEARING SCHEDULING (Improper Termination) – March 22, 2021

Union then proceeded to correct Massa's improper termination by scheduling a post hoc hearing with UPS.  (Plf.'s Ex. 2; Bates no. 393).  Irrespective of Massa's refusal to resign, a hearing is scheduled to resolve Mass's improper termination.  (Massa; 53:7-19).  Johnson was not informed of Massa's knee injury until February-March 2021.  (Johnson; 125:18:25, 127:10-19).  When Johnson becomes aware of Massa's accident and subsequent knee surgery, he proceeds to schedule a hearing to appeal Massa's improper discharge and return him to work.  (*Id.*; 129:2-15).  When the shop steward and UPS management are unable to resolve a dispute, a contested matter may be escalated to a hearing.  (*Id.*; 80:6-20).  However, the hearing cannot be scheduled unilaterally by the Union.  UPS' labor manager had to agree to hold a hearing.  (*Id.*; 80:21-25, 81:1-5).  Johnson and Dore agree to hold a hearing on behalf of Massa.  (*Id.*; 131:4-20).  Johnson testified that there must be a determination regarding the propriety of Massa's termination.  (*Id.*; 118:3-17).  Johnson further stated that Massa's work absence attributable to his disability would allow the Union to void Massa's termination by UPS.  (*Id.*; 118:18-25, 119:1-2).

### III. <u>LEGAL STANDARD FOR SUMMARY JUDGMENT</u>

A dispute over material facts is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he inquiry is whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 252.

### IV. <u>DISCUSSION</u>

### A. <u>CONVINCING MOSAIC STANDARD</u>

Notwithstanding the extent to which the McDonnell Douglas framework is applicable to Massa's retaliation claims, an employee can survive summary judgment by presenting "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent" by establishing a convincing mosaic of circumstantial evidence for disparate treatment discrimination claims under Title VII and the ADA. *Jenkins v. Nell*, 26 F. 4th 1243, 1250-1251 (11th Cir. 2022) (cleaned up). A "convincing mosaic" may be shown by evidence that demonstrates, among other things, suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent may be drawn. *See generally Lewis v. Union City, Georgia*, 877 F.3d 1000 (11th Cir. 2017). For Massa's race and disability discrimination claims, "establishing the

elements of the McDonnell Douglas framework is not, and never was intended to be, the sine qua non for a plaintiff to survive a summary judgment motion in an employment discrimination case."  *Lewis v. City of Union City, Georgia*, 934 F. 3d 1169, 1185 (11th Cir. 2019).  Furthermore, identifying a proper comparator is not a requirement.  ("Accordingly, the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case."; *Id.* (cleaned up)).  "Even without similarly situated comparators, "the plaintiff will always survive summary judgment if he [or she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  *Id.*

Massa was subjected to an adverse employment action when he was terminated on October 13, 2020.  While Massa was able to return to work, Massa declined to accept the $250 payment option to resign, and was thus terminated from his employment at UPS on October 13, 2020.  While labor manager Dore conveyed the $250 offer to shop steward Howard, the prior events were orchestrated by Harrill.  In particular, Dore stated his role was more advisory in nature and "not, you know, the executioner of any of these processes."  (Dore; 77:8-10).  Dore states that Massa building manager Liz Harrill had the authority to terminate Massa.  (*Id.*; 53:19-24; 54:21-24; Doc. 34-5, ¶ 5).  Harrill was Massa's supervisor overseeing the Bayside facility and "in charge of everyone at the building".  (Massa, 26:13-18; Dore; 17:10-13).  Harrill work schedule overlapped

with the hours Massa worked at the UPS Bayside facility.  (Harrill; 27:15-25).

Dore also testified that Harrill informed Dore that a 48-hour termination notice

should be sent to Massa – but did not inform him of Massa's injury.  (Dore; 55:12-

24, 56:3-8).  However, Harrill did not inform Dore of the reason for Massa's work

absence – the knee injury.  (*Id.*; 56-22-24).  Harrill's animus was a "but-for" cause

of, or a determinative influence on, Dore's ultimate decision.   Harrill was always

the ultimate decision maker and influenced Dore to merely convey the $250 offer.

Dore testified that the Harrill independently evaluated Massa's attendance and

recommended termination.  "Under the cat's paw doctrine, a plaintiff may

establish but-for causation if she shows that the unbiased decision-maker . . .

followed a 'biased recommendation without independently investigating the

complaint against the employee.'" *Godwin v. WellStar Health Sys., Inc.*, 615 F.

App'x 518, 528 (11th Cir. 2015) (quoting *Stimpson v. City of Tuscaloosa*, 186 F.3d

1328, 1332 (11th Cir. 1999)).  Applying the cat's paw doctrine to but-for causation

simply requires that the supervisor's influence with the decisionmaker be strong

enough to actually cause the adverse employment action.  *See Univ. of Tex.*

*Southwestern Med. v. Nassar*, 570 US 388 (2013).  Cat's paw doctrine allows for

liability as long as the decision maker did not make an independent investigation

but instead relied upon the ill-motivated supervisor's formal recommendation.

Aside from Harrill, her Tom Teimer ("Teimer") sporadically signed disciplinary

notices, but Harrill testified signing the computer-generated disciplinary letters is merely ministerial.  (Harrill; 50:12-25, 51:1-11; 27:10-14).  As the pre-load supervisor, Harrill performed tasks regarding attendance and other employee matters.  (*Id.*; 41:14-22).  For example, Teimer forwarded Massa's disability form to Harrill "because that was my job".  (*Id.*; 22:3-16).  Harrill also testified that she did not discuss the substance of the form but only acknowledged receipt.  (*Id.*; 24:15-22).  Just like Teimer, regarding Dore as the ultimate decisionmaker would also be questionable.  Under Harrill's influence, Dore had already signed-off on termination papers but realized open grievances would prevent finalizing Massa's termination under the CBA and extends the $250 offer.

## B. <u>ADA and TITLE VII DISCRIMINATION (Wrongful Discharge)</u>

Culminating with his termination, Massa was subjected to racial discrimination at the outset of his employment with UPS, and then disability discrimination after his injury.  After his knee injury, UPS did not provide Massa with the requisite assistance to navigate the disability application process.  Furthermore, while Massa's supervisor Harrill took no action to prevent the UPS computer system from generating successive disciplinary letters, Harrill also processed the letters to terminate Massa while having knowledge of Massa's knee injury.  UPS uses a pretexual reason of Massa's absences due to his knee injury and subsequent surgery to assert that his premature termination was not

contrary to the governing CBA.  Massa sent text messages to UPS supervisor Harrill and the Union shop stewards.  (Massa; 26:2-12).  Harrill does testify that shop steward Howard also informed her of the injury.  (Harrill; 43:22-25,44:1-3). UPS supervisor Harrill possessed evidence in the form of Massa's text messages to refute the company's attendance records but instead allowed the UPS computer system to issue successive discipline leading to Massa's premature termination.  Foremost, Massa required major surgery from a knee injury incurred on November 25, 2019.  (Plf.'s Ex. 3).  The following day, Massa informed his supervisor Harrill and union steward Joey Howard of his injury via text message to inform them of his accident.  The text message(s) also contained a photograph of Massa's displaced kneecap.  (Massa; 111:9-11. Massa; 26:2-10; 106:14-20).  However, Harril does not inform labor manager Dore of Massa's cancelled medical insurance benefits until March 2021.  (Dore; 71:8-18).  Harrill regularly communicated with the Dore in-person, via text and telephone regarding employee discipline.  (*Id.*; 17:24-25, 18:1-8).  Nevertheless, Harrill did not believe it was a necessity to inform Dore of the events surrounding Massa's injury and did not recall doing so.  (Harrill; 45:9-25).  UPS finally discharged Massa on discriminatory grounds when Massa was offered $250 to resign or be terminated.  Since Dore disputes the characterization of the $250 offer, the adverse employment action element presents a genuine factual dispute.

## B.1.  <u>ADA DISCRIMINATION ("Qualified Individual")</u>

Massa presents his disability discrimination claim based on UPS terminating his employment due to unauthorized work absence(s).  The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to . . . [the] discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds . . . ."  Id. § 12111(8).  To prevail on an ADA disparate treatment claim, Massa must demonstrate that: "(1) he was disabled, (2) he was a 'qualified individual' when he was terminated, and (3) he was discriminated against on account of his disability."  *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016).  Additionally, "A party that obstructs or delays the interactive process is not acting in good faith.  A party that fails to communicate, by way of initiation or response, may also be acting in bad faith.").  *Bultemeyer v. Ft. Wayne Comm. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996).

Defendant asserts summary judgment is due on this claim because Plaintiff is not a "qualified individual" due to (1) an indefinite leave from work; and (2) an inability to perform manual labor required of his position. Nevertheless, Plaintiff must show either that he could have performed the

essential functions of his job without accommodation, or that he could have

performed the essential functions of his job if Defendant had provided a

reasonable accommodation.  *See Davis v. Fla. Power & Light Co.*, 205 F.3d 1301,

1305 (11th Cir. 2000).  An individual is qualified if "with or without reasonable

accommodation, [he] can perform the essential functions of the employment

position...." 42 U.S.C. § 12111(8).

Initially, Massa required a leave of absence due to his injury and

subsequent knee surgery.  While UPS was aware that Massa would require short

term disability leave, Massa would have returned to work within the reasonably

immediate future to render him a qualified individual.  *See Duckett v. Dunlop Tire*

*Corp.*, 120 F.3d 1222, 1226 (11th Cir. 1997) (cleaned up); *see also Wood v. Green*, 323

F. 3d 1309 (11th Cir. 2003) (a leave of absence allowing an employee to return to

work "in the immediate future" is deemed a reasonable accommodation).  Even

more compelling for the instant case is the *Duckett* court's comment that "ADA

regulations may possibly be violated if an employee was terminated immediately

upon becoming disabled without a chance to use his leave to recover."  *Id.* n. 2.

Massa was not requesting indefinite leave.  Upon instruction by Harrill, Lucciola,

and Howard, Massa inquired into FMLA leave but was deemed ineligible.

(Massa; 26:8-25).  Subsequently, after the denial of Massa's insurance benefits,

Massa applied for and then began his short-term disability leave.  A particular

short-term disability form completed by Massa's physician reflects July 1, 2020, as Massa's estimated return to date work after surgery rehabilitation.  (Plf.'s Ex. 3; Bates No.  JTMASSA133).  This form was further processed by Harrill on April 9, 2020 (and also signed by Massa on March 31, 2020).  *Id.*

First, Massa testified that he had rehabilitated his injury on schedule and was able to return to work around June 2020.  (Massa; 30:21-25; 31:1-4).  At that juncture Massa was able to return to work with or without an accommodation. "Whether a job function is 'essential' must be evaluated on a case-by-case basis." *Holly v Clairson Indus.*, 492 F.3d 1247, 1256 (11th Cir. 2007).  While absences may have been the pretexual basis for Massa's termination, the absences are due to an underlying failure to accommodate the disability.  An extended absence could have been avoided with a reasonable accommodation.  Massa also testified that he was able to return to work "very early on" to perform sedentary tasks or "light stuff and the mail".  (Massa; 71:1-9).  While UPS labor manager Dore was uncertain about a light-package sorter, Dore testified there are positions at the Bayside location to accommodate employees with disabilities.  (Dore; 78:11-25; 79:1-15).  Massa also testified that injured employees were routinely provided alternate positions.  (Massa; 99:3-12; 24-25).  Dore's testimony regarding the essential functions of the package sorter position is sufficient to create a jury question whether Massa was a qualified individual under the ADA.  A

reasonable jury hearing that testimony could find that if Massa had any physical restrictions, it did not mean that he could not perform the essential functions of the position.  Defendant's assertions regarding Massa's unavailability to work, and physical requirements of the job create multiple factual disputes regarding valid essential functions of the job, and also whether Massa was able to perform the essential function of his job with a reasonable accommodation.

### B.2.  TITLE VII (Race) DISCRIMINATION

While lying in wait for the UPS computer system to issue absence related disciplinary letters, Harrill allows the termination process to proceed against Massa.  To establish a prima facie case with respect to his race and national origin discrimination claims, Mass must show that: "(1) he is a member of a protected class; (2) he was subject to an adverse employment action; (3) his employer treated similarly situated employees outside of his protected class more favorably than it treated him; and (4) he was qualified to do the job." *Rainey v. Holder*, 412 F. App'x 235, 237–38 (11th Cir. 2011).  When a plaintiff is unable to produce a comparator, he can still present a triable issue of fact through direct evidence of discriminatory intent or through a "convincing mosaic" of circumstantial evidence that would allow an inference of discriminatory intent.  *Lewis v. City of Union City*, 918 F.3d 1213, 1220 n.6 (11th Cir. 2019) (en banc).

In contrast to an at-will employment relationship, the governing rules of the CBA required the employer UPS to collaborate with the Union regarding the employee Massa. Massa filed numerous detailed grievances explicitly charging racial discrimination and harassment – with many demanding the termination of Harrill. (Plf.'s Ex. 5). Massa testified that he was racially discriminated against from the very beginning of his employment. (Massa; 28:10-12). Employees of other races, along with employees without seniority were given preferential treatment with work schedules and tasks. (Massa; 28:10-22; Plf.'s Ex. 5, Bates no. 324). In particular, Massa charged that he was placed in unsafe hazardous situations because of discrimination. (Plf.'s Ex. 5, Bates no. 295). Massa testified that he was subject to race discrimination from the outset of his tenure with UPS and would prevent him from working more hours. (Massa; 28:9-12). Massa would be constantly disciplined after provocation from UPS due to his race – "it happened – it was every single day I went to work." (*Id.*; 80:2-15). Massa filed 100 to 150 detailed grievances regarding race discrimination but all were disregarded by the Union and UPS. (*Id.*; 81:16-23). A particular three-page grievance alleging race discrimination due to different treatment than other workers was filed against Harrill in 2019. (Massa; 85:2-14). However, this particular grievance, like countless others, has disappeared. UPS did not produce hundreds of detailed discrimination grievances that Massa had filed

against UPS.  (Massa; 85;15-25, 86:1-2).  A UPS business record reflects a chart of grievances filed by Massa and yet the chart does not list any discrimination grievances and particularly not the ones presented in Plaintiff's exhibit no. 5. (Plf.'s Ex. 4; Bates nos. D-JM-34, 35).  Multiple grievances charging race discrimination against Harrill and demanding Harrill's termination were signed upon receipt by Harrill.  (Plf.'s Ex. 5).  Harrill signs a particular race discrimination grievance filed against her on August 13, 2019.  (*Id.*, Bates no. 319).  Yet, Harrill testified that she has never been accused of race discrimination. (Harrill: 13:2-4).  Her denial creates a genuine dispute of a material fact.

## C.  TITLE VII (Race) and ADA RETALIATION

Title VII of the Civil Rights Act prohibits retaliation against any employee who "has opposed any practice made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3(a).  A prima facie claim of retaliation under Title VII requires Massa to demonstrate that (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse employment action; and (3) there was a causal connection between his protected activity and the adverse action. *Lucas v. W.W. Grainger*, 257 F.3d 1249, 1260 (11th Cir. 2001).  ADA retaliation claims are "under the same rubric used for Title VII retaliation claims." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999).

By taking a material adverse employment action against Massa, in the form of wrongful termination, UPS retaliated against Massa.  UPS' stated reason for termination is pretextual and proffered to disguise retaliatory animus.  A plaintiff who claims retaliation under Title VII (and ADA) must establish that his protected activity was a "but for" cause of the adverse action.  After the plaintiff establishes a prima facie case, the employer must prove, as part of its affirmative defense, that the protected activity was not the "but for" cause of the adverse action.

To establish a causal connection between a protected activity and an adverse action, "a plaintiff must show that the decision-makers were aware of the protected conduct and that the protected activity and the adverse action were not wholly unrelated."  *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (quoting *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000)) (quotations and alterations omitted).  To establish this showing, a plaintiff must establish that "the decision maker was aware of the protected conduct at the time of the adverse employment action."  *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).   "As a starting point for any retaliation claim, a plaintiff needs to show (among other things) that the decisionmaker actually knew about the employee's protected expression."  *Martin v. Fin. Asset Mgmt. Sys.*, 959 F.3d 1048, 1053 (11th Cir. 2020) (emphasis added).

The plaintiff must generally establish that the employer was aware of the protected expression when it took the adverse employment action. *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997). Furthermore, causation must be established according to traditional principles of but-for causation, which require proof that the desire to retaliate was the but-for cause of the challenged action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 352, 360 (2013).*

### C.1.  <u>KNOWLEDGE OF TITLE VII PROTECTED ACTIVITY</u>

Massa was retaliated against by UPs because he engaged in statutorily protected expression by filing numerous grievance complaints regarding race discrimination. Multiple grievances charging race discrimination against Harrill and demanding Harrill's termination were signed upon receipt by Harrill. (Plf.'s Ex. 5). Harrill signs a particular race discrimination grievance filed against her on August 13, 2019. (*Id.*, Bates no. 319). Actual knowledge of protected activity of Massa's race-based complaints and Massa's knee injury allowed Harrill the perfect cover to allow the UPS termination process to take its course. However, Harrill testified that she has never been accused of race discrimination. (Harrill: 13:2-4). Harrill's denial creates a genuine dispute as to a material fact.

### C.2.  <u>KNOWLEDGE OF ADA PROTECTED ACTIVITY</u>

While Massa does not have knowledge of disciplinary correspondence from UPS, Massa becomes aware that his medical insurance has been cancelled in January 2020 upon a visit to his doctor's office.  Massa immediately proceeds to complain to Harrill that his medical insurance has been cancelled after he became disabled (and requested FMLA leave).  Massa is further disturbed that he is potentially terminated.  At this juncture, the UPS supervisor Harrill had actual knowledge of protected activity but in retaliation allows the UPS termination process to take its course.  Harrill had actual knowledge (directly and constructively) of protected activity, and the computer-generated disciplinary letters allowed perfect cover for her to further process Massa termination. Harrill, in perfunctory manner, only instructs Massa to apply for short-term disability benefits after his complaint.  (Harrill; 45:9-12).  Massa later recounts that he is instructed to apply for short-term disability after complaining to Harrill regarding the cancellation of his medical benefits. (Plf.'s Ex. 1, Bates no. MASSA375; Massa's subsequent October 13, 2020, text to Howard: "No one ever said to get on short term after I get denied from FMLA").

Harrill allowed the complaints regarding the cancellation of Massa's insurance benefits to prejudice her in the processing of Massa's termination. (Harrill; 41:14-22: Harrill testifying that attendance-based discipline is one of her primary duties).  To establish this final causal requirement for a prima facie case

of retaliation, the employee need only demonstrate that the protected activity and the adverse action were not wholly unrelated. *Shotz v. City of Plantation*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003). "Magic words" are not required to put an employer on notice, but protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue. *Martin v. Financial Asset Management Systems, Inc.*, 959 F. 3d 1048, 1059-1060 (11tth Cir. 2020). Massa expressed his complaint in his communication with Harrill and shop stewards to inform them of the cancellation of medical benefits after he became disabled and had applied for extended FMLA leave. Massa testified that while he contacted Union shop stewards regarding the cancellation of his insurance, he did not file a formal written grievance. (Massa; 34:1-4). Still yet, a formal, written grievance should not be deemed the sole means to establish protected activity. Massa believed the cancellation of his medical insurance and potential termination by UPS violated the ADA. The subject matter of Massa's complaint to Harrill was sufficient to alert UPS that unlawful discrimination was at issue. Based on the context, UPS should be charged with notice of protected activity based on actual knowledge. A genuine factual dispute exists regarding the necessity of filing a written grievance to establish protected activity when Massa did not trust the union – especially when Massa had to pay for his own

medical bills.  (Massa' out-of-pocket medical bills exceeded $10,000; Plf.'s Ex. 2, Bates no. 397).

Still yet, at the time of the medical benefit cancellation, Massa also complained to the Union shop stewards, and the shop steward Lucciola assured Massa that the matter would be resolved.  (Plf.'s Ex. 1; Bates no. 374; Massa, 33:8-21; 95:3-23).  The actual knowledge of the disability complaint is further established because the shop steward assures Massa that a resolution will be sought regarding the cancellation of his medical benefits.  Harrill and Lucciola had a unique relationship based solely to resolve employee disputes.  It is a reasonable inference that Lucciola further discussed Massa's complaint regarding the insurance cancellation with Harrill.  Plaintiff does not have to show management's knowledge of his disability complaint solely by direct evidence.  Awareness of the protected activity may also be established by producing circumstantial evidence from which a reasonable jury could infer the decision maker's knowledge.  *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002) (discussing cases).  A plaintiff may produce circumstantial evidence to establish this element of his claim.  *See Id.*  And, she "need only offer circumstantial evidence that could reasonably support an inference" that Von Bodungen and other of Defendant's agents making a decision to terminate Plaintiff knew of her protected activity."  *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009).  Harrill's

relationship with a Union shop steward is limited to issues regarding employees. (Harrill; 30:22-25; 31:1-2).  Harrill is the building supervisor that disciplines employees.  (*Id.;* 41:11-20).  Massa is reassured by Lucciola that he will seek a resolution.  (Massa; 33:1-21).  Lucciola had also instructed Massa to apply for short-term disability. (*Id.*; 98:7-17). Aside from Massa's direct complaint to Harrill, awareness of Massa's protected conduct is further supported by reasonable inferences from the evidence that Lucciola discussed Massa's complaint regarding the insurance cancellation with Harrill.  Harrill is the building supervisor and the contact person to resolve Massa's complaint.  However, Harrill claims that she would not necessarily be involved with grievances.  (Harrill 37:2-14).  Harrill also denies retaliating due to an employee's complaint for [disability] discrimination.  (*Id.*; 13:5-10).  While UPS generally disputes knowledge of any protected activity, a reasonable jury could conclude that the shop steward would inform the building manager that protected activity had occurred.

A jury could conclude that Massa's complaint to UPS regarding the cancellation of medical benefits, and potential termination, was because of his knee disability.  Massa's conduct conveyed a protest of discriminatory practices by UPS.  A reasonable jury could find that Harrill orchestrated the finalization of Massa's termination for retaliatory reasons rather than a good faith belief of an

unapproved leave of absence.  Circumstantial evidence alone is sufficient to demonstrate awareness.  "A plaintiff need show only that the expression and adverse action are not completely or wholly unrelated." *Williams v. Polk County Board of County Commissioners*, No. 8:20-cv-2842-WFJ-SPF, (M.D. Fla. Nov. 18, 2022) (citing *Jones v. Gulf Coast Health Care of Del.*, LLC, 854 F.3d 1261, 1271 (11th Cir. 2017) (FMLA retaliation); *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998) (Title VII retaliation)).

Courts construe the causation element "broadly" and "a plaintiff need only demonstrate 'that the protected activity and the adverse action were not wholly unrelated.'"  *Debe v. State Farm Mut. Auto. Ins.*, 860 F. App'x 637, 639 (11th Cir. 2021) (citing *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 n. 30 (11th Cir. 2003)).  To do so, however, "[t]he plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action." *Id.*  Causation may be established where "numerous adverse events . . . occurred within weeks after each of [the plaintiff's] protected acts."  *Norman v. McDonough*, No. 2:20-cv-01765-KOB, 2022 WL 3007595, at *9 (N.D. Ala. July 28, 2022).  Even until the $250 offer, Massa remained discharged from the UPS payroll database.  (Johnson; 157:12-21).

### C.3.  <u>TEMPORAL PROXIMITY</u>

"Context matters". *Burlington N & S.F.R. Co. v. White*, 548 U.S. 53, 69 (2006). Temporal proximity and its measurement are deemed just one piece of evidence to establish causation. *See Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018). There must be other circumstantial evidence of retaliation. *Id.* "The relatedness between the protected activity and adverse action generally may be demonstrated by close temporal proximity between them….But mere temporal proximity, without more, must be very close." *Jones v. Unity Behavioral Health, LLC*, No. 20-14265, 2021 U.S. App. LEXIS 34835, at *5-6 (11th Cir. Nov. 23, 2021) (citing Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007)). Still yet, there were not any intervening events to sever any causal inference. *Henderson v. Fedex Express*, 442 F. App'x 502, 506 (11th Cir. 2011)). While Massa was not present at the workplace, the termination process continued against Massa. While the adverse employment action – namely the $250 offer – did not occur immediately – the facts of the case allow Massa to establish legal temporal proximity and the length of time should not undermine any inference of causation. Here, a reasonable jury could find that the temporal proximity between Harrill's knowledge of Massa's protected activity and the adverse employment action supports an inference of causation. Massa must demonstrate that UPS' provided reason is pretextual – that is, that the protected activity was the but-for cause of the adverse employment action. *Pennington v. City of*

*Huntsville*, 262 F.3d 1262, 1266 (11th Cir. 2001); *see Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1190 n.13 (11th Cir. 2020) (applying the but-for causation test at the pretext stage of the summary judgment examination rather than applying it to the plaintiff's prima facie case).

## D. <u>PRETEXT ANALYSIS FOR MASSA'S CLAIMS</u>

UPS' stated reason – unapproved leave of absence – for termination is pretextual and proffered to disguise retaliatory and discriminatory animus.  A plaintiff who claims discrimination and retaliation under Title VII (single-motive) and ADA must establish that his protected activity was a "but for" cause of the adverse action.  After the plaintiff establishes a prima facie case, the employer must prove, as part of its affirmative defense, that the protected activity was not the "but for" cause of the adverse action.

UPS' supposed "legitimate" attendance-based reason for terminating Massa is undermined by the facts mentioned supra as evidence of a convincing mosaic.  A genuine issue of fact exists about whether Massa's absence from work was unexcused.  Massa had informed the Union shop stewards and the building manager of his knee injury.  In opposing a motion for summary judgment, an employee may make that showing by presenting evidence that calls into question an employer's sincere belief in its proffered reasons for the employee's termination.  *See Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir.

2005).  To establish pretext at the summary judgment stage, a plaintiff must

demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies,

or contradictions in the employer's proffered legitimate reasons for its action that

a reasonable fact-finder could find them unworthy of credence."  *Jackson v. Ala.*

*State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting *Combs v.*

*Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).  Still yet, while having

actual knowledge of Massa's complaints regarding race and disability

discrimination against Harrill constituting protected activity, a reasonable jury

could further find that UPS circumvented the CBA and did not halt the

computer-generated termination letter process.  Massa has established the

inconsistent application of policies as additional circumstantial evidence of

discrimination as well as pretext.  *See Berg v. Fla. Dep't of Labor & Emp't Sec.*, 163

F.3d 1251, 1255 (11th Cir.1998) (noting that "inconsistent application of

employment policies [may be] circumstantial evidence of discrimination").  Still

yet, viewing the individual events as one adverse employment event –

culminating in the $250 offer – a reasonable jury could find retaliation was the

but-for cause of Massa's termination. "So long as the plaintiff's sex [or other

protected characteristic at issue] was one but-for cause of that decision, that is

enough to trigger the law."  *See Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731

(2020) (cleaned up).  Massa has provided evidence from which the jury could

reasonably conclude that but for his alleged protected act(s), UPS would not have terminated him.

## V. <u>CONCLUSION</u>

The court "may not weigh conflicting evidence or make credibility determinations" and if there are "disputed issues of fact, the court may not decide them; rather, [it] must deny the motion and proceed to trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012). Based upon the foregoing, Plaintiff requests that this Court enter and order denying the UPS' Motion for Summary Judgment and for any other relief this Court deems just and proper under the circumstances.

Dated: May 30, 2023                    Respectfully submitted,

*/s/ Derek P. Usman*
Derek P. Usman
Florida Bar No. 0120303
Email: derek@usmanfirm.com
505 East Jackson Street, Suite 305
Tampa, FL 33602
(813) 377-1197 telephone
*Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 30th day of May, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record appearing on the Certificate of Service generated by the ECF system.

*/s/ Derek P. Usman*
Derek P. Usman